**NOT FOR PUBLICATION**

UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

```
                              :
AVIVA PARTNERS LLC, et al.,   :   CIVIL ACTION NO. 05-3098 (MLC)
                              :
      Plaintiffs,             :   MEMORANDUM OPINION
                              :
      v.                      :
                              :
EXIDE TECHNOLOGIES, et al.,   :
                              :
      Defendants.             :
_____:
```

**COOPER, District Judge**

Plaintiffs commenced this action against defendants, Exide
Technologies ("Exide"), Craig H. Mulhauser ("Mulhauser"), Ian J.
Harvie ("Harvie"), and J. Timothy Gargaro ("Gargaro")
(collectively, "defendants"), on behalf of all those that
purchased or otherwise acquired Exide's common stock between May
5, 2004 and May 17, 2005 (the "class period").  (Compl., at ¶¶ 1,
18-19, 26.)  Plaintiffs allege that defendants violated certain
provisions of the Securities Exchange Act of 1934, 15 U.S.C. §
("Section") 78 et seq., and Securities Exchange Commission Rule
10b-5 ("Rule 10b-5"), 17 C.F.R. § 240.10b-5.  (Id. ¶¶ 167, 172.)
Defendants move to dismiss the complaint pursuant to Federal
Rules of Civil Procedure ("Rules") 12(b)(6) and 9(b) and the
Private Securities Litigation Reform Act of 1995 ("PSLRA"),
Section 78u-4 et seq.  (Dkt. entry no. 35.)  For the reasons
stated herein, the Court will deny the motion.

**BACKGROUND**

Exide "manufactures and supplies lead acid batteries, associated equipment, and services for transportation and industrial customers worldwide." (Compl., at ¶ 18.)  Mulhauser was Exide's President and Chief Executive Officer from the beginning of the class period until March 3, 2005.  (Id. at ¶ 19(a).)  Harvie served as Exide's Chief Financial Officer from the beginning of the class period until October 12, 2004, and also served as the company's Vice President and Corporate Controller from the beginning of the class period until September of 2005.  (Id. at ¶ 19(b).)  Further, Gargaro served as Exide's Chief Financial Officer and Executive Vice President from October 2004 until December 2005.  (Id. at ¶ 19(c).)  Plaintiffs allege that due to their positions, Mulhauser, Harvie, and Gargaro were privy to undisclosed information regarding, inter alia, Exide's business, operations, products, operational trends, financial statements, markets, and present and future business prospects. (Id. at ¶ 20.)

The class period relevant to this action began on May 5, 2004, the effective date of Exide's Plan of Reorganization under Chapter 11 of the United States Bankruptcy Code.  (Id. at ¶ 37.) In connection with its restructuring effort, Exide obtained a $600 million Senior Credit Facility from a group of lenders, including Deutsche Bank Securities.  (Id. at ¶ 34; Pls. Br., at 5.)  The Senior Credit Facility was subject to, inter alia,

financial obligations requiring Exide to (1) maintain a specified ratio of debt to equity ("leverage ratio covenant"), and (2) achieve minimum consolidated earnings before interest, taxes, depreciation, and amortization ("EBITDA covenant").  (Compl., at ¶ 35.)

Exide issued a press release on its Plan of Reorganization's effective date, in which Mulhauser stated:

> This is an historic day for Exide and our global workforce. During the past two years, we have maintained our commitment to meeting the needs of our customers.  The reorganization process has enabled us to resolve financial issues and improve our operations. Exide is now able to capitalize on our global network and focus our full capabilities on making our customers successful and creating long-term value for our shareholders.

(Id. at ¶ 37 (emphasis omitted).)  Further, the press release explained that:

> the Company implemented a number of cost reduction initiatives including the closure or consolidation of certain manufacturing and distribution facilities, reductions in workforce and corporate overhead, and making quality and productivity improvements through EXCELL, the Company's lean supply chain process improvement initiative.

(Id. at ¶ 38 (emphasis omitted).)

Exide, on June 29, 2004, released its financial results for its fiscal year 2004, which ended on March 31, 2004.  (Id. at ¶ 39.)  The press release reported a net loss of $114.1 million, or $4.17 per diluted share on net sales of $2.5 billion.  (Id.) Nevertheless, Mulhauser commented:

3

During fiscal 2004, Exide continued execution of our operational restructuring initiatives, primarily in Europe, while meeting the needs of our customers despite a delay in our exit from Chapter 11 in North America. With our emergence from Chapter 11 in May 2004, we are now able to focus our total efforts on meeting the challenges we face in today's market to deliver long-term value to our shareholders.

(Id. (emphasis omitted).)  Also, the press release noted that:

the Company continues to streamline and simplify its global operations through a number of cost reduction, quality and productivity initiatives throughout the world.  These initiatives involve the closure or consolidation of certain manufacturing and distribution facilities, reduction in salaried personnel, and further improvements in quality and productivity through EXCELL, the Company's lean supply chain process improvement initiative.

(Id. (emphasis omitted).)

Exide filed a Form 10-K with the Securities Exchange Commission ("SEC") listing its financial results for its fiscal year 2004.  (Id. at ¶ 40.)  The Form 10-K stated that the financial results conformed with GAAP, and noted that Exide's inventories were "stated at the lower of cost or market."  (Id. at ¶ 41.)  The Form 10-K also stated that based upon its financial forecasts and plans, Exide believed it would comply with the financial covenants contained in its Senior Credit Agreement "for the foreseeable future."  (Id. at 45.)  Mulhauser and Harvie each signed certifications contained in the Form 10-K stating, inter alia, that (1) the report does not contain any untrue statements of material fact or material omissions, (2) they have established, or supervised the establishment of,

4

disclosure controls and procedures to ensure that material information concerning Exide is made known to them, and (3) they have disclosed in the report any changes in the internal control over financial reporting in the most recent fiscal quarter that has materially affected or is reasonably likely to materially affect Exide's internal control over financial reporting.  (<u>Id.</u> at ¶ 42.)

Mulhauser made a number of statements regarding Exide's 2004 financial results during a conference call on July 1, 2004, including the following:

> Our financial reorganization has provided Exide with a great foundation for future growth and profitability and I'm extremely excited by the future of our Company.
>
> Through operational restructuring initiatives and our EXCELL lean supply chain process improvements, we have improved product quality, reduced costs, enhanced productivity, [and] increased service levels to our customers. . . .  Exide is now well positioned to capitalize on . . . making our customers successful [and] creating long-term value for our shareholders.
>
> In the near-term, we will drive further improvements to productivity, quality, cost reduction, and customer satisfaction.
>
> [W]e are working to continue to reduce costs, improve quality, and reduce lead times to our customers.  We will continue to drive this through our EXCELL lean supply chain initiative, more aggressive supplier procurement initiatives across the Company and further reductions in salaried headcounts and discretionary spending.
>
> [W]e have made significant progress through our financial reorganization to . . . provide a sound foundation for future growth and profitability. . . . [W]e are well-positioned to make sound investments in

5

> our future which will create value for our customers
> and our new shareholders.
>
> Exide is very well-positioned to take full advantage of
> this fresh start.

(Id. at ¶ 46 (emphasis omitted).)  Moreover, Harvie commented,

"we are pleased with the foundation we've laid for future growth

opportunities in order to provide value to our shareholders."

(Id. at ¶ 47.)

Exide issued a press release on August 12, 2004 announcing

its financial results for the first quarter of its fiscal year

2005.  (Id. at ¶ 48.)  Exide reported combined pre- and post-

bankruptcy fiscal year net income of $1.782 billion on

consolidated quarterly net sales of $612.5 million.  (Id.)  In

the press release, Mulhauser explained:

> We have made continued progress this quarter executing
> our restructuring and strategic growth initiatives . .
> . .  We are focused on strengthening Exide's position
> as an industry leader and creating long-term value for
> our shareholders.  The Company remains committed to
> successfully implementing our restructuring plans while
> improving our operating cash flow, driving cost
> reductions, improving quality, developing new business
> and mitigating the impact of increasing lead prices on
> our financial results. . . .  We have the financial
> foundation in place to support our future growth and
> profitability.

(Id. (emphasis omitted).)  During a conference call pertaining to

the press release held that same day, Mulhauser made a number of

statements regarding Exide's reorganization and potential for

future growth, including the following:

> [O]ur financial reorganization has provided Exide with
> a sound foundation for future growth and profitability,
> and I'm excited by the future of our company.
>
> Exide was "on plan and on budget" in its efforts to
> streamline and simplify the business.

(Id. at ¶ 55 (emphasis omitted).)  Mulhauser also stated that

Exide was accelerating efforts to reduce costs, improve quality,

and reduce customer lead time.  (Id.)

Exide filed a Form 10-Q with the SEC listing its financial

results for the first quarter of its fiscal year 2005.  (Id. at ¶

49.)  The Form 10-Q noted that the financial results conformed

with GAAP.  (Id. at ¶ 50.)  The Form 10-Q also stated that based

upon its financial forecasts and plans, Exide believed it would

comply with the financial covenants contained in the Senior

Credit Agreement "for the foreseeable future."  (Id. at ¶ 54.)

Mulhauser and Harvie each signed certifications contained in the

Form 10-Q stating, inter alia, that (1) the report does not

contain any untrue statements of material fact or material

omissions, (2) they have established, or supervised the

establishment of, disclosure controls and procedures to ensure

that material information concerning Exide is made known to them,

and (3) they have disclosed in the report any changes in the

internal control over financial reporting in the most recent

fiscal quarter that has materially affected or is reasonably

likely to materially affect Exide's internal control over

financial reporting.  (Id. at ¶ 51.)

Mulhauser announced on October 12, 2004 that he intended to leave Exide on or before April 1, 2005.  (Id. at ¶ 56.) Nevertheless, Mulhauser assured the public that Exide was "well positioned to expand its global presence in the marketplace, aided in large part by its successful emergence from Chapter 11 bankruptcy proceedings in May."  (Id.)  One month later, on November 15, 2004, Exide issued a press release announcing its financial results for the second quarter of its fiscal year 2005, which ended on September 30, 2004.  (Id. at ¶ 57.)  The press release stated:

> Consolidated net sales for the second quarter of fiscal 2005 rose 8.5% to $637.6 million from $587.4 million in the second quarter of fiscal 2004. . . .

> Consolidated net loss for the second quarter of fiscal 2005, including restructuring costs of $4.8 million, reorganization costs of $1.7 million and gain on revaluation of warrants liability of $12.1 million, was $17.1 million . . . .

> Consolidated net sales for the first half of fiscal 2005 rose 6.7% to $1.25 billion from $1.17 billion in the first half of fiscal 2004.

> Consolidated net income for the first half, including Fresh Start accounting adjustments, restructuring costs, reorganization items, gain on revaluation of warrants liability, gain on the discharge of liabilities subject to compromise and cumulative effect of change in accounting principle was $1.77 billion compared to a net loss of $54.3 million in the first half of 2004.

(Id.)  In the press release, Mulhauser commented:

> In the second half, we believe the Company will realize additional benefits from the lead hedging, pricing actions, restructuring and cost reductions implemented

in the first half of fiscal year 2005 to mitigate the
impact of higher lead prices.

(Id. at ¶ 58.)

Exide filed a Form 10-Q with the SEC listing its financial
results for the second quarter of its fiscal year 2005.  (Id. at
¶ 59.)  Both Harvie and Gargaro signed the Form 10-Q.  (Id. at ¶
60.)  The Form 10-Q stated that the consolidated financial
information contained therein included "all adjustments of a
normal recurring nature necessary for a fair statement of the
results of operations and financial positions for the periods
presented." (Id. at ¶ 60.)  Further, the Form 10-Q noted that in
November 2004, Exide obtained amendments to the leverage ratio
covenant and EBITDA covenant contained in its Senior Credit
Agreement due to "dramatic increase in lead costs year on year
and the resultant adverse impact upon the Company's results".
However, the Form 10-Q represented that taking these and other
amendments into account and based upon Exide's financial
forecasts and plans, it believed it would comply with the
financial covenants "for the foreseeable future."  (Id. at ¶ 61.)
Mulhauser and Gargaro each signed certifications contained in the
Form 10-Q asserting, inter alia, that (1) the report does not
contain any untrue statements of material fact or material
omissions, (2) they have established, or supervised the
establishment of, disclosure controls and procedures to ensure
that material information concerning Exide is made known to them,

9

and (3) they have disclosed in the report any changes in the internal control over financial reporting in the most recent fiscal quarter that has materially affected or is reasonably likely to materially affect Exide's internal control over financial reporting.  (Id. at ¶ 62.)

Defendants held a conference call on November 16, 2004 to discuss Exide's second quarter financial results, in which Gargaro stated that "although, there can be no assurances", Exide's management believed it would comply with the financial covenants contained its Senior Credit Agreement for the foreseeable future.  (Id. at ¶ 65.)  Gargaro also emphasized that Exide's management felt "comfortable with the bank arrangements and the amendment that has been put in-place.  And the relaxing that was done in EBITDAR calculations was basically to provide [Exide] headroom for the volatility of lead".  (Id. at ¶ 66.) Moreover, Mulhauser made the following statements about Exide's implementation of cost-cutting initiatives:

> [O]ur cost reduction programs for the first half are on schedule with continued progress on headcount reductions, lean manufacturing initiatives and control of overhead spending generating approximately $20 million in cost savings year-on-year.  We're also continuing to develop plans for further cost reductions and productivity improvements in manufacturing, logistics, and purchasing in both North America and Europe.

> [W]e continue to accelerate our efforts to further reduce costs, improve quality and improve service and delivery to our customers. . . .  Further cost reductions and productivity improvement in

> manufacturing, logistics and purchasing have also been
> identified and specific plans are in development for
> both North America and Europe.  Our progress in this
> area is also demonstrated by the awards and
> certifications we received for our quality and service
> during the quarter.

(Id. at ¶ 67 (emphasis omitted).)

Exide issued a press release on February 9, 2005 stating its intention "to offer $350 million aggregate principal amount of senior notes due in 2013".  (Id. at ¶ 68.)   The press release explained that Exide would use the proceeds of the offering to, inter alia, repay a portion of its debt under the Senior Credit Agreement.  (Id.)  A few days later, on February 14, 2005, Exide issued a press release announcing its financial results for the third quarter of its fiscal year 2005.  (Id. at ¶ 69.)  Exide revealed that it violated the leverage ratio covenant contained in its Senior Credit Agreement, but assured investors that "it requested and expects to receive a waiver of the leverage ratio covenant from its lenders, as well as amendments relating the to the Company's proposed senior note offering."  (Id.)  Moreover, Exide reported that:

> Consolidated net sales for the third quarter of fiscal
> 2005 rose 11.5% to $727.9 million from $653.0 million
> in the third quarter of fiscal 2004. . . .

> Consolidated net loss for the third quarter of fiscal
> 2005 was $439.0 million, or $17.56 per share, compared
> to a net loss of $9.3 million, or $0.34 per share, in
> the third quarter of fiscal 2004.

(Id. at ¶ 70.)  Mulhauser assured the public that Exide was committed to "creating long-term value for [its] shareholders" and would "continue its efforts to implement plans and make investments to accelerate cost reductions and increase cash flow from operations."  (Id. at ¶ 71.)

Exide also held a conference call on February 14, 2005, in which Gargaro made the following statements regarding Exide's financial results for its third quarter of 2005:

> [P]artially because a large percentage of our debt is euro denominated, the continued fall of the dollar against the euro has inflated the value of our debt, so we did not satisfy our leverage ratio covenant as of December 31, 2004 under our senior secured credit facility.  We have requested and expect to receive a waiver of the leverage ratio covenant from our lenders, as well as amendments relating to the Company's proposed senior note offering.
>
> During the quarter, our businesses have continued to make progress in driving operational improvements in inventory and receivables despite the impact of lead on our working capital investment and currency translation, which, combined, have had an impact over the last 12 months of well over 100m in our working capital investment.
>
> The Company has made tremendous strides, particularly on the inventory and receivables investment, to make progress against these outside factors.  In addition, we continued discussions with our trade suppliers about returning our credit terms to normalized levels. Since our adjusted EBITDA have more than doubled from the second quarter, we believe that our suppliers' continued cooperation and support will contribute to a strengthening of our balance sheet and our liquidity.

(Id. at ¶ 72 (emphasis omitted).)  Further, Mulhauser commented that Exide was accelerating its efforts to reduce costs and

12

improve quality, service, and delivery to customers, and noted that Exide's "strategic initiative [was] working to establish Exide as the industry leader and positioning us to build on our success." (Id. at ¶ 73.)

Exide filed a Form 10-Q with the SEC listing its financial results for the third quarter of its fiscal year 2005, which ended on December 31, 2004. (Id. at ¶ 74.)  Both Harvie and Gargaro signed the Form 10-Q.  (Id.)  The Form 10-Q noted that Exide obtained amendments to the leverage ratio covenant and EBITDA covenant contained in its Senior Credit Agreement in November of 2004 due to "the dramatic increase in lead costs year on year and the resultant adverse impact upon the Company's results".  (Id. at ¶ 75.)  It also explained:

> Due to the fact that the Company failed to satisfy its
> leverage ratio covenant as of December 31, 2004 under
> the Credit Agreement, in February 2005, the Company
> received a waiver of the leverage ratio covenant from
> its lenders, as well as amendments relating to the
> Company's proposed senior note offering.  Although
> there can be no assurances, the Company believes,
> taking into account the Credit Agreement amendments and
> based upon its updated financial forecasts and plans,
> that it will comply with the covenants contained in its
> Credit Agreement for the foreseeable future.

(Id. (emphasis omitted).)  Mulhauser and Gargaro each signed certifications contained in the Form 10-Q asserting, inter alia, that (1) the report does not contain any untrue statements of material fact or material omissions, (2) they have established, or supervised the establishment of, disclosure controls and

procedures to ensure that material information concerning Exide
is made known to them, and (3) they have disclosed in the report
any changes in the internal control over financial reporting in
the most recent fiscal quarter that has materially affected or is
reasonably likely to materially affect Exide's internal control
over financial reporting. (Id. at ¶ 76.)  Moreover, the form
states that the Chief Executive Officer and Chief Financial
Officer, together with other management, evaluated Exide's
disclosure controls and procedures and concluded that they are
effective to ensure that material information is disclosed to the
SEC within the time periods specified in the SEC's rules and
forms. (Id. at ¶ 77.)  However, the Form 10-Q also noted that
Exide had begun reviewing, documenting, and testing its internal
control procedures, and had "identified certain controls and
areas of [its] control environment in which [it] need[ed] to
undertake remediation efforts." (Id.)

Exide filed a Form 8-K with the SEC on February 28, 2005,
stating that it had entered into a third amendment to its Senior
Credit Agreement, which lowered its EBITDA covenant for the
twelve-month period ending March 31, 2005. (Id. at ¶ 79.)
Shortly thereafter, Exide issued a press release announcing that
instead of offering $350 million of senior notes, it would offer
$60 million of floating rate convertible senior subordinated
notes, and $290 million of senior notes. (Id. at ¶ 80.)  Thus,

14

on March 15, 2005, Exide instituted its $350 million combined senior note and convertible note offering.  (See id. at ¶ 81.)  In a press release issued that same day, Exide explained that it intended to "use the proceeds from a successful offering to reduce the Company's bank indebtedness, provide greater liquidity, continue restructuring efforts to improve the Company's cost structure, and for general corporate purposes."  (Id. at ¶ 82.)

Exide issued a press release on May 16, 2005, announcing that it expected to violate the leverage ratio covenant and EBITDA covenant contained in its Senior Credit Agreement, as amended.  (Id. at ¶ 134.)  Specifically, the May 16, 2005 press release provided:

> [A]djusted EBITDA for the fiscal year ended March 31, 2005 will be in the range of $100-107 million [, which is below the required covenant amount of $122 million].  The expected covenant issues primarily relate to the impact of commodity costs; the loss of overhead absorption due to an inventory-reduction initiative; other fourth-quarter inventory valuation adjustments; and costs associated with Sarbanes-Oxley compliance efforts.

(Id. at ¶ 134.)  According to plaintiffs, defendants explained that Exide had been required to write off $4.5 million of obsolete inventory and approximately $1.4 to $2.8 million on a contract with the United States government, and had not accurately forecasted inventory reductions, leading to a $6 million loss pertaining to absorbed overhead costs.  (Pls. Br., at 12.)  The following morning, Exide's stock fell from $11.15

15

per share to $5.75 per share, and ultimately closed that evening at $6.88 per share.  (Compl., at ¶ 135.)  During a May 17, 2005 conference call, Gargaro made a number of statements addressing Exide's current financial condition, including the following:

> In terms of our leverage test the expected covenant issue was a result of this lower EBITDA level not because of the amount of debt that the Company had on its balance sheet. . . .

> Several unanticipated or unusual items impacted our preliminary results during the quarter in the range of 15 to 20 million.  Those items include inventory write-offs of approximately 4.5 million related to obsolescence adjustments and physical inventories which were a result of the year-end process.  Of this amount, 2 million was the result of noncash obsolescence charges in Europe, resulting from ongoing SKU reduction efforts and discontinued product lines.  We have initiated more clearly, defined procedures to ensure that we better manage these issues going forward to minimize the financial impact of these ongoing efforts. We also continue to refine our inventory cycle counting processes and other control enhancements as a means of earlier identification of inventory issues.

> The Company had forecast inventory reductions in the fourth quarter.  But clearly not to the levels we ultimately achieved.  In March alone we reduced consolidated inventories by over 30 million.  Compared with the same quarter last year the reduction was even more pronounced.  The result being a $6 million loss of absorbed overhead cost.  That said, we are not satisfied and we are improving our forecasting capabilities and forward visibility.  We are implementing a more structured forecasting methodology that better connects sales and production planning cycles and we expect to have these more robust processes in place within the next 30 to 45 days.  Our goal from these efforts is to drive even greater management accountability. . . .

> Finally, we have recorded adjustments of approximately 1.5 to $2 million to reconcile pricing and commercial items in accordance with contractual provisions

16

> applying to a large customer in North America.  While
> we are disappointed in the weakness in our checks and
> balances, in this instance, we believe the controls we
> have in place are appropriate.  We also believe we have
> made appropriate personnel changes to assure that our
> controls function as intended going forward.

(Id. at ¶ 136 (emphasis omitted).)  Following this conference

call, Exide's stock fell from its closing price of $6.88 on May

17, 2005 to a closing price of $5.33 on May 18, 2005.  (Id. at ¶

137.)

## DISCUSSION

### I.   Legal Standards

#### A.   Rule 12(b)(6), Rule 9(b), and the PSLRA

A court may dismiss a complaint for "failure to state a

claim upon which relief can be granted."  Fed.R.Civ.P. 12(b)(6).

On a motion to dismiss a court generally must accept as true all

of the factual allegations in the complaint, and must draw all

reasonable inferences in favor of the plaintiffs.  Cal. Pub.

Employees' Ret. Sys. v. Chubb Corp., 394 F.3d 126, 134 (3d Cir.

2004); Doe v. Delie, 257 F.3d 309, 313 (3d Cir. 2001).  However,

a court need not credit bald assertions or legal conclusions

alleged in the complaint.  Morse v. Lower Merion Sch. Dist., 132

F.3d 902, 906 (3d Cir. 1997).  "Dismissal of claims [on a motion

to dismiss] is appropriate only if it appears beyond doubt that

the plaintiff can prove no set of facts in support of his claim

upon which relief may be granted."  Jakomas v. McFalls, 229

F.Supp.2d 412, 419 (W.D. Pa. 2002).

17

A securities fraud action, however, "requires more than mere reference to the conventional standard applicable to motions under Rule 12(b)(6)." C.W. Sommer & Co. v. Rockefeller (In re Rockefeller Ctr. Props., Inc.), 311 F.3d 198, 215 (3d Cir. 2002). Rather, the PSLRA and Rule 9(b) impose heightened pleading requirements that must be satisfied for a complaint sounding in securities fraud to survive a motion to dismiss. See In re Advanta Corp. Sec. Litig., 180 F.3d 525, 531 (3d Cir. 1999).

Rule 9(b) states, "[i]n all averments of fraud or mistake, the circumstances constituting fraud or mistake shall be stated with particularity." Fed.R.Civ.P. 9(b). "This particularity requirement has been rigorously applied in securities fraud cases." In re Burlington Coat Factory Sec. Litig., 114 F.3d 1410, 1417 (3d Cir. 1997). Though Rule 9(b) does not require the plaintiffs to plead every material detail of the fraud, it nevertheless "requires, at a minimum, that the plaintiffs support their allegations of securities fraud with all of the essential factual background that would accompany the first paragraph of any newspaper story – that is, the who, what, when, where and how of the events at issue." Chubb Corp., 394 F.3d at 144; In re Rockefeller, 311 F.3d at 217.

Application of Rule 9(b) prior to discovery, however, "may permit sophisticated defrauders to successfully conceal the details of their fraud." Shapiro v. UJB Fin. Corp., 964 F.2d

272, 284 (3d Cir. 1992) (internal quotations omitted).
"Accordingly, the normally rigorous particularity rule has been relaxed somewhat where the factual information is peculiarly within the defendant's knowledge or control."  In re Burlington Coat Factory, 114 F.3d at 1418.

Plaintiffs alleging securities fraud must also comply with the heightened pleading requirements of the PSLRA.  Chubb Corp., 394 F.3d at 144.  The PSLRA requires plaintiffs to

> specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and, if an allegation regarding the statement or omission is made on information and belief, the complaint shall state with particularity all facts on which that belief is formed.

15 U.S.C. § 78u-4(b)(1).  This "particularity [requirement] extends that of Rule 9(b) and requires plaintiffs to set forth the details of allegedly fraudulent statements or omissions, including who was involved, where the events took place, when the events took place, and why any statements were misleading."  In re Rockefeller, 311 F.3d at 218.  Thus, the PSLRA imposes another layer of factual particularity on securities fraud claims.  Chubb Corp., 394 F.3d at 144.

The PSLRA also modifies the burden of pleading intent, or scienter, by requiring plaintiffs to "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind."  15 U.S.C. § 78u-4(b)(2).  To establish the requisite strong inference that the defendant acted

19

with scienter, the plaintiffs must allege facts that either (1) "show that defendants had both motive and opportunity to commit fraud", or (2) "constitute circumstantial evidence of conscious misbehavior or recklessness". In re Suprema Specialties, Inc. Sec. Litig., 438 F.3d 256, 276 (3d Cir. 2006); see also In re Digital Is. Sec. Litig., 357 F.3d 322, 328-29 (3d Cir. 2004). "Either way, plaintiffs must plead facts 'with particularity,' and these facts must give rise to a 'strong inference' of a knowing or reckless misstatement." In re Digital Is., 357 F.3d at 329-330 (noting that the PSLRA requires a "strong inference" of scienter to survive a motion to dismiss; a reasonable inference is insufficient).

A plaintiff's failure to meet the heightened pleading requirements set forth in Rule 9(b) and the PSLRA justifies dismissal of the complaint apart from Rule 12(b)(6) dismissal. Chubb Corp., 394 F.3d at 145. Accordingly, a modified Rule 12(b)(6) analysis is employed in the securities fraud context in which "catch-all" or "blanket" assertions that do not comply with the particularity requirements of Rule 9(b) and the PSLRA are disregarded. Id. Therefore, "unless plaintiffs in securities fraud actions allege facts supporting their contentions of fraud with the requisite particularity mandated by Rule 9(b) and [the PSLRA], they may not benefit from inferences flowing from vague or unspecific allegations--inferences that may arguably have been justified under a traditional Rule 12(b)(6) analysis." Id.

**B.    Section 10(b) and Rule 10b-5**

Section 78j ("Section 10(b)")[1] and Rule 10b-5 create

liability for securities fraud.  Section 10(b) provides, in

pertinent part:

> It shall be unlawful for any person, directly or
> indirectly, by the use of any means or instrumentality
> of interstate commerce or of the mails, or of any
> facility of any national securities exchange –
>
>> (b) To use or employ, in connection with the
>> purchase or sale of any security registered on a
>> national securities exchange or any security not
>> so registered, . . . any manipulative or deceptive
>> device or contrivance in contravention of such
>> rules and regulations as the [SEC] may prescribe
>> as necessary or appropriate in the public interest
>> or for the protection of investors.

15 U.S.C. § 78j.  Rule 10b-5, which establishes a private cause

of action, was promulgated by the SEC in order to implement this

section.  Blue Chip Stamps v. Manor Drug Stores, 421 U.S. 723,

729 (1975).  Rule 10b-5 makes it unlawful:

> (a) To employ any device, scheme, or artifice to
> defraud,
>
> (b) To make any untrue statement of a material fact or
> to omit to state a material fact necessary in order to
> make the statements made, in light of the circumstances
> under which they were made, not misleading, or
>
> (c) To engage in any act, practice, or course of
> business which operates or would operate as a fraud or

---

[1] Before the Securities Exchange Act was codified, the
contents of Section 78j appeared in section 10(b) of Public Law
73-291.  See 73 Pub.L.No. 291, 48 Stat. 881 (1934).  As a result,
this provision is commonly referred to as Section 10(b) of the
Securities Exchange Act.

deceit upon any person, in connection with the purchase
or sale of any security.

17 C.F.R. § 240.10b-5.

To state a claim for relief under Section 10(b) and Rule
10b-5, a plaintiff must plead facts that satisfy the heightened
pleading requirements of Rule 9(b) and the PSLRA, and must
demonstrate that (1) the defendant made a materially false or
misleading statement or omitted a material fact necessary to make
a statement not misleading, (2) the defendant acted with
scienter, and (3) the plaintiff relied on the defendant's
misstatements or omissions and this caused the injury.  Chubb
Corp., 394 F.3d at 143.

### 1.   False or Misleading Statements

Defendants can be liable for both affirmative misstatements
and misleading omissions.  Omissions, however, can give rise to
liability only where the defendant had an affirmative duty to
disclose the information in question, such as "when there is
insider trading, a statute requiring disclosure, or an
inaccurate, incomplete or misleading prior disclosure."  Oran v.
Stafford, 226 F.3d 275, 285-86 (3d Cir. 2000); see In re Aetna
Inc. Sec. Litig., 34 F.Supp.2d 935, 948 (E.D. Pa. 1999) ("There
is a duty to disclose information when disclosure is necessary to
make defendants' other statements, whether mandatory or
volunteered, not misleading.").  Under Section 10(b) and Rule
10b-5, each statement at issue must be analyzed to determine

22

whether each alleged misrepresentation is pled with the requisite particularity. In re Westinghouse Sec. Litig., 90 F.3d 696, 712 (3d Cir. 1996). Both pre-class period data and post-class period data can be used to ascertain what the defendant should have known during the class period. In re Merck & Co., Inc. Sec. Litig., 432 F.3d 261, 272 (3d Cir. 2005) (explaining that "any information that sheds light on whether class period statements were false or materially misleading is relevant").

### 2. Materiality

Rule 10b-5 "explicitly require[s] a well-pleaded allegation that the purported misrepresentations or omissions at issue were material." In re Rockefeller, 311 F.3d at 211. A fact is material only if "there [is] a substantial likelihood that [it] would have been viewed by the reasonable investor as having significantly altered the 'total mix' of information made available" to the investing public. TSC Indus., Inc. v. Northway, Inc., 426 U.S. 438, 449 (1976). The "materiality of disclosed information may be measured post hoc by looking to the movement, in the period immediately following disclosure, of the price of the firm's stock." In re Merck & Co., Inc., 432 F.3d at 269 (discussing the efficient market hypothesis).

### 3. Scienter

"[T]o state a violation under Rule 10b-5, plaintiffs must allege that defendants acted with the requisite state of mind."

In re Rockefeller, 311 F.3d at 211.  To be actionable, a material
misstatement "must be made with conscious or reckless disregard
of its falsity."  In re ATI Techs., Inc., Sec. Litig., 216
F.Supp.2d 418, 428 (E.D. Pa. 2002).  As noted supra, to establish
this state of mind the plaintiffs must plead facts that either
(1) constitute circumstantial evidence of either reckless or
conscious behavior or (2) establish a "motive and opportunity" to
commit fraud.  In re Suprema Specialties, Inc., 438 F.3d at 276.

    Conscious misbehavior is alleged by "stating with
particularity facts giving rise to a strong inference of
conscious wrongdoing, such as intentional fraud or other
deliberate illegal behavior."  In re Advanta, 180 F.3d at 535.
"A reckless statement is one 'involving not merely simple, or
even inexcusable negligence, but an extreme departure from the
standards of ordinary care, and which presents a danger of
misleading buyers or sellers that is either known to defendant or
is so obvious that the actor must have been aware of it.'"  In re
Digital Is., 357 F.3d at 332.  Motive and opportunity are
properly stated when a plaintiff alleges facts showing that the
defendants "had the motive to commit fraud and a 'clear
opportunity' to do so."  Wilson v. Bernstock, 195 F.Supp.2d 619,
633 (D.N.J. 2002).

### 4.   Reasonable Reliance

To state a claim for securities fraud under Section 10(b) and Rule 10b-5, the plaintiffs must demonstrate that they reasonably relied on the defendants' allegedly fraudulent misrepresentations or omissions.  <u>Jones v. Intelli-Check, Inc.</u>, 274 F.Supp.2d 615, 632 (D.N.J. 2003).  Defendants here do not contest that reasonable reliance has been properly alleged.

### 5.   Damages

Plaintiffs in securities fraud cases must plead (1) damages and (2) that their reliance on the fraud proximately caused those damages.  <u>See</u> <u>Semerenko v. Cendant Corp.</u>, 223 F.3d 165, 174 (3d Cir. 2000).  This second requirement is sometimes called pleading "loss causation".  <u>See</u> <u>id.</u> at 184.

### C.   The Forward-looking Statement Safe Harbor

The PSLRA contains a safe harbor provision, which protects certain forward-looking statements from Section 10(b) and Rule 10b-5 liability.  The safe harbor provision states:

> in any private action arising under [the PSLRA] that is based on an untrue statement of a material fact or omission of a material fact necessary to make the statement not misleading, a person . . . shall not be liable with respect to any forward-looking statement, whether written or oral, if and to the extent that--
> (A) the forward-looking statement is–
> (i) identified as a forward-looking statement, and is accompanied by meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the forward-looking statement; or
> (ii) immaterial; or

> (B) the plaintiff fails to prove that the forward-looking statement—
>> (i) if made by a natural person, was made with knowledge by that person that the statement was false or misleading.

15 U.S.C. § 78u-5(c)(1).  In the case of an oral forward-looking statement, the requirements set forth in paragraph (A) are satisfied if (1) the oral statement is accompanied by a cautionary statement noting that the statement is forward-looking and results might materially differ from the projections, (2) the oral statement is accompanied by another oral statement indicating that information concerning risk factors that might cause the actual results to materially differ from the projections is readily available in a written document, (3) such written document is specifically identified, and (4) such written document contains a cautionary statement listing important factors that could cause actual results to differ from the projections.  15 U.S.C. § 78u-5(c)(2).  This safe harbor was designed to protect statements discussing revenue projections and future business plans from creating liability.  In re Merck & Co., Inc., 432 F.3d at 272.

**D.   Section 20(a)**

Section 78t(a) ("Section 20(a)")[2] creates a cause of action against individuals who are "control persons" of companies committing securities fraud.  Jones, 274 F.Supp.2d at 644.  It states:

> Every person who, directly or indirectly, controls any person liable under any provision of this chapter or of any rule or regulation thereunder shall also be liable jointly and severally with and to the same extent as such controlled person to any person to whom such controlled person is liable, unless the controlling person acted in good faith and did not directly or indirectly induce the act or acts constituting the violation or cause of action.

15 U.S.C. § 78t(a).  Under this section, individuals are held liable for exercising control over a corporation that has committed securities fraud.  In re MobileMedia Sec. Litig., 28 F.Supp.2d 901, 940 (D.N.J. 1998).  A plaintiff alleging a Section 20(a) violation "must plead facts showing: (1) an underlying violation by the company; and (2) circumstances establishing defendant's control over the company's actions."  Jones, 274 F.Supp.2d at 645.  Thus, if the plaintiffs do not establish that any controlled person is liable under the PSLRA, then there can be no controlling person liability under Section 20(a).  In re Suprema Specialties, Inc., 438 F.3d at 287.

---

[2] Before the Securities Exchange Act was codified, the contents of Section 78t(a) appeared in section 20(a) of Public Law 73-291.  See 73 Pub.L.No. 291, 48 Stat. 881 (1934).  As a result, this provision is commonly referred to as Section 20(a) of the Securities Exchange Act.

## II.  Section 10(b) and Rule 10b-5 Standards Applied Here

Defendants contend that the complaint should be dismissed
because plaintiffs' claims are based on information and belief
and they failed to "state with particularity <u>all</u> <u>facts</u> upon which
[their] belief is formed."  (Defs. Br., at 7 (emphasis and
addition in original).)  However, plaintiffs have identified
defendants' allegedly misleading statements with the
particularity required by Rule 9(b) and the PSLRA.  Plaintiffs
have specifically set forth in their detailed complaint each
statement they believe was false or misleading, whether the
statement was made by a particular defendant or in a press
release, the context in which each statement was made, and the
reasons why they believe each statement was false or misleading.
Thus, plaintiffs have adequately established the who, what, when,
where and how of the events at issue.  See <u>Chubb Corp.</u>, 394 F.3d
at 144; <u>In re Rockefeller</u>, 311 F.3d at 217.

To meet their pleading burden, plaintiffs rely primarily on
confidential sources from various Exide divisions, who
corroborate one another's assertions, including, (1) a former
Exide Cost Accountant, Financial Analyst and Treasury Analyst
(the former "Financial and Treasury Analyst"), who performed an
obsolete inventory analysis just prior to the class period, (2) a
former Executive Assistant to the President of Exide's North
America Transportation Division, (3) a former employee who

28

simultaneously acted as a production manager, logistics manager, and superintendent for Exide's Bristol, Tennessee plant, (4) a former "Lean Agent", and (5) a Regional Support Manager. (Compl., at ¶¶ 92-96.)  Each of the confidential informants was a high-level Exide employee during some portion of the class period.  Id.  Plaintiffs have appropriately described the positions formerly held by each of these sources as well as the basis of the sources' personal knowledge.  (Id.)  Compare Chubb Corp., 394 F.3d at 148-54 (concluding that the plaintiffs had not met their burden because the confidential sources they relied upon were low-level, branch office employees working in departments other than the department at issue, and thus, these sources lacked personal knowledge concerning the defendant's national business in a separate department).  Moreover, as discussed in more detail below, plaintiffs have adequately pled that defendants' statements were false or misleading when made, and have established the strong inference of scienter required by the PSLRA's heightened pleading standard.  See 15 U.S.C. § 78u-4(b)(2).  Specifically, plaintiffs have alleged facts showing conscious misbehavior or recklessness on the part of defendants. See In re Suprema Specialties, Inc., 438 F.3d at 276.

### A.  Defendants' Statements Were False or Misleading

The Third Circuit, in In re Advanta Corp., analyzed whether statements made by a corporate defendant and its officers were

materially false or misleading.  180 F.3d 525.  In that case,
Advanta Corporation ("Advanta"), a leading issuer of MasterCard
and Visa credit cards, instituted a new policy of issuing credit
cards with lower teaser rates and longer introductory periods
than standard industry practice in order to attract riskier
customers.  Id. at 528.  Many of these new, riskier customers
defaulted on their repayment obligations, which increased the
company's delinquency rates and increased costs related to
uncollectible card holder balances.  Id.  The shareholders of
Advanta brought a securities class action against it and several
of its officers claiming that Advanta failed to disclose its
"teaser rates" policy despite knowledge of the risks involved.
Id.  The shareholders further claimed that Advanta's officers
made various false or misleading statements, including the
following statement made by Advanta's Vice President for Investor
Relations:

> Over the next six months Advanta will experience a
> large increase in revenues as it converts more than $5
> billion in accounts that are now at teaser rates of
> about 7% to its normal interest rate of about 17%.

Id.  The shareholders also identified the following statements in
which Advanta allegedly portrayed itself in an unduly positive
light even though it knew such statements were false or
misleading:

> Despite a challenging industry environment, we are
> pleased to report that Advanta produced continued,
> consistent earnings growth in the third quarter.

> The challenges in the delinquency and charge-off rates
> from year-to-year . . . reflect the trend in unsecured
> credit quality which is being experienced throughout
> the credit industry.
>
> This dividend increase reflects management's confidence
> in the company's earnings momentum and Advanta's
> continuing commitment to enhancing shareholder value.
>
> I am pleased to report that in 1996 Advanta maintained
> the growth of its current businesses and accelerated
> its expansion into new ventures.

Id. at 529.  The shareholders alleged, inter alia, that both the

Vice President's statement and these positive portrayals violated

Section 10(b) and Rule 10b-5.  Id.  Advanta moved to dismiss the

shareholders' complaint, and the district court granted the

motion.  Id.

The Third Circuit, in addressing the appeal, noted that the

PSLRA contains a safe harbor provision that protects certain

forward-looking statements from Rule 10b-5 liability.  Id. at

535.  The court explained that the statement made by Advanta's

Vice President for Investor Relations constituted a forward-

looking statement because it involved a projection of revenues as

well as a statement of the plans and objectives of management for

future operations.  Id. at 536.  Nevertheless, the court

explained that the safe harbor does not apply if the statement is

made with actual knowledge that it is false or misleading.  Id.

The only fact listed in the complaint, which supported the

shareholders' allegation that the Vice President knew his

statement was false, was a statement made nine months later by

another Advanta employee that Advanta was "probably not as aggressive as [it] could have been at [repricing rates]".  Id. The court concluded that this statement was not really inconsistent with the Vice President's earlier statement, and thus, determined that the shareholders' complaint did not plead any specific facts supporting the inference that Advanta had actual knowledge that the Vice President's statement was false. Id.  Thus, the court held that the statement was protected by the PSLRA's safe harbor provision.  Id. at 537.

The court also considered whether the shareholders adequately pled their claims with respect to the positive portrayal statements.  Id.  The court stated, "Rule 10b-5 liability does not attach merely because 'at one time the firm bathes itself in a favorable light' but 'later the firm discloses that things are less rosy.'" Id. at 538 (quoting DiLeo v. Ernst & Young, 901 F.2d 624, 627 (7th Cir. 1990)).  The court noted that during the period that Advanta made the positive portrayal statements it (1) implemented policies relaxing underwriting and monitoring procedures causing superior credit risk customers to switch to other credit card companies at rates causing a materially negative impact on the Advanta's earnings, (2) changed its methodology for computing bankruptcy charge-offs but did not disclose this change to the public, (3) repriced its teaser rates to only 13 or 14 percent, rather than the usual 17 percent,

causing a substantial decline in revenues, and (4) lacked adequate collections capabilities to support the expansion of its customer base.  Id.  However, the court disagreed with the shareholders' assertion that the juxtaposition of these facts against the positive portrayal statements indicated that those statements were false or misleading.  Id.  The court stated that Advanta was merely accurately reporting its previous successes and expressing confidence in its prospects for future growth. Id.  The court explained that "vague and general statements of optimism 'constitute no more than 'puffery' and are understood by reasonable investors as such.'" Id.  Thus, the court concluded that the positive portrayal statements were all either accurate reports of past earnings or non-actionable expressions of optimism for the future.  Id. at 539.

Plaintiffs here have essentially alleged that during the class period, "defendants overstated Exide's inventory and net income and understated Exide's net losses while also misrepresenting that Exide's reorganization in bankruptcy had positioned it for growth, profitability and the creation of long-term value for its shareholders."  (Compl. at ¶ 3.) Specifically, Plaintiffs challenge statements made following Exide's emergence from bankruptcy, which, inter alia, (1) characterized its reorganization as enabling it to resolve financial issues, improve operations, and create long-term value

33

for shareholders, and (2) described the company's cost reduction initiatives. (Compl., at ¶¶ 37-39.)  Plaintiffs also challenge statements made in Exide's Form 10-K for its fiscal year 2004, Form 10-Qs for the first three quarters of its fiscal year 2005, and during conference calls discussing Exide's financial results for these periods, which represent that (1) Exide's financial results conformed with GAAP and inventory was listed at the lower of cost or market, (2) Exide believed it would comply with the financial covenants contained in its Senior Credit Agreement "for the foreseeable future", even after such covenants were amended, (3) the reports were accurate and true, (4) Exide's management had established, or supervised the establishment of, effective disclosure controls and procedures to ensure that they were aware of all material information concerning Exide's financial status, and (5) Exide's financial reorganization provided a great foundation for future growth and profitability. (Id. at ¶¶ 41-43, 45-48, 50-52, 54-56, 60-63, 65, 67, 71, 75-77.)  Further, plaintiffs assert that defendants improperly described Exide as having "continued to make progress in driving operational improvements in inventory and receivables", and making "tremendous strides, particularly on the inventory and receivables investment" when it knew Exide was accruing large amounts of obsolete inventory. (Id. at ¶ 72.)

34

Published earnings figures that are allegedly false or misleading are the types of statements actionable under Section 10(b) and Rule 10b-5.  See Shapiro, 964 F.2d at 283.  Unlike the Advanta defendants, defendants' statements here were allegedly neither accurate reports of Exide's previous successes nor vague expressions of optimism about the company's prospects for future growth.  Instead, the statements at issue are allegedly inaccurate or false descriptions of Exide's restructuring effort, income and net losses, ability to comply with its loan covenants, internal controls, and inventory.  Further, plaintiffs do not rely on the juxtaposition of certain tenuous facts to support their assertion that defendants' statements were false or misleading.  They set forth specific facts that were known to defendants during the time period when the allegedly false or misleading statements were made, which give rise to a direct inference that the statements were not correct when made. Further, plaintiffs have  alleged that defendants disclosed distorted financial data to the public by failing to report Exide's inventory at the lower of cost or market in violation of GAAP.  See In re Burlington Coat Factory Sec. Litig., 114 F.3d at 1417-18 ("where plaintiffs allege that defendants distorted certain data disclosed to the public . . . we have required plaintiffs to state what the unreasonable practices were and how they distorted the disclosed data").

Plaintiffs have adequately pled that defendants inaccurately reported Exide's financial results and overstated the success of its bankruptcy reorganization despite their knowledge of the difficulties Exide was encountering with, among other things, its internal controls, obsolete inventory, customer service, and billing.  Compare Advanta, 180 F.3d at 538-39.  Thus, plaintiffs' allegations "comply with both Rule 9(b) and PSLRA standards because they specify the allegedly misleading statements and proffer facts to support their allegations that these statements were misleading."  In re Lucent Techs., Inc. Sec. Litig., 217 F. Supp. 2d 529, 553 (D.N.J. 2002).  Therefore, this Court finds that plaintiffs have satisfied the first inquiry in the securities fraud analysis, and thus, the statements are actionable if they were both material and made with scienter.[3]  See infra.

We caution, however, that we do not hold that every word uttered in the statements at issue can give rise to liability. Much of the language in these press releases, conference calls, and SEC filings is puffery, and therefore not actionable.  While we hold that the false or misleading nature of these statements

_____

[3] Further, 17 C.F.R. § 210.4-01(a)(1) states: "Financial statements filed with the [SEC] which are not prepared in accordance with generally accepted accounting principles will be presumed to be misleading or inaccurate . . . ."  Thus, the Exide filings that plaintiffs allege violated GAAP are actionable misstatements under Rule 10b-5.  See In re Campbell Soup Sec. Litig., 145 F.Supp.2d 574, 592 (D.N.J. 2001).

has been adequately pled, our holding is confined to those portions of the statements that make specific representations about Exide's inventory, net income, successful restructuring effort, ability to comply with its loan covenants, and effective internal controls. It is Exide's representations concerning these specific items, and not the vague expressions of hope and confidence that surround many of them, such as statements that "[w]e are focused on strengthening Exide's position as an industry leader and creating long-term value for our shareholders", that we hold to be well-pled false or misleading statements.

### B.   Whether There is a Strong Inference of Scienter

This Court, in addition to finding that plaintiffs have sufficiently pled that defendants' statements were false or misleading when made, also finds that plaintiffs have alleged the requisite scienter with respect to the statements at issue. Defendants assert that plaintiffs failed to plead (1) facts demonstrating that defendants had actual knowledge that their statements were false when made, (2) a strong inference that defendants were reckless, or (3) that the individual defendants had a motive and opportunity to commit the alleged fraud. (Defs. Br., at 39-44). This Court disagrees with those contentions, however, and finds that plaintiffs have met their burden of pleading scienter.

37

The Third Circuit, in <u>Advanta</u>, analyzed whether the shareholder plaintiffs had demonstrated the requisite scienter under Section 10(b) and Rule 10b-5 by establishing that the defendants acted with conscious or reckless disregard for their statements' falsity.  180 F.3d at 539.  The court explained that conscious misbehavior is alleged by "stating with particularity facts giving rise to a strong inference of conscious wrongdoing, such as intentional fraud or other deliberate illegal behavior." <u>Id.</u> at 535.  However, the court noted that "allegations that a securities-fraud defendant, because of his position within the company 'must have known' a statement was false or misleading are 'precisely the types of inferences which [courts], on numerous occasions, have determined to be inadequate to withstand Rule 9(b) scrutiny.'" <u>Id.</u> at 539.  The court ultimately concluded that the facts set forth in the complaint indicated that Advanta had been mismanaged, but did not suggest that Advanta had egregiously departed from the range of reasonable business decisions.  <u>Id.</u>

Plaintiffs here have alleged sufficient facts that, if established, could demonstrate that defendants acted with conscious or reckless disregard for truth under the <u>Advanta</u> standard when they made statements concerning Exide's income, inventory, internal controls, ability to comply with its financial covenants, and "successful" restructuring effort during

the class period.  Plaintiffs do not simply allege that
defendants "must have known" that their statements were false by
virtue of their positions in the company.  Instead, plaintiffs
detail certain facts that the individual defendants did know,
which constitute circumstantial evidence of reckless or conscious
behavior.  See In re Suprema Specialties, Inc., 438 F.3d at 276.
Specifically, plaintiffs assert, based on information obtained
from and corroborated by the confidential informants, that (1)
Mulhauser received "Obsolete Inventory Reports" from Exide's
former Financial and Treasury Analyst shortly before the class
period, which indicated that Exide had accumulated millions of
dollars of obsolete inventory by early 2004 and the amount was
increasing, (2) the Financial and Treasury Analyst informed
Mulhauser that the obsolete inventory that had accumulated during
Exide's bankruptcy reorganization had to be written off, but
Mulhauser did not write off such inventory until the end of the
class period, (3) Mulhauser received weekly sales reports during
the class period indicating that Exide was not meeting its sales
targets, which in turn suggested that it was accumulating
additional obsolete inventory, (4) there were "more batteries in
the warehouse than [it] was shipping out" at Exide's Bristol,
Tennessee plant, and there were also "tons" of obsolete inventory
at its Fort Smith, Arkansas and Salinas, Kansas plants, (5)
Exide's former Government Contract Administrator informed Harvie

in December 2004 that Exide had only 5,000 of the 23,000 batteries required to fulfill a contract the company had with the United States government, (6) in December 2004, Harvie stated "[i]f that inventory is gone how can we possibly account for other materials?", (7) according to former Exide employees, the company lacked an adequate inventory tracking system for many years, (8) Exide fabricated its inventory reports and there were always fewer batteries at Exide's branch stores than such inventory reports indicated, (9) Exide failed to report its obsolete inventory at the lower of cost or market in violation of GAAP, (10) Exide's billing systems frequently failed to generate invoices and send them to customers, (11) customer service significantly deteriorated following Exide's bankruptcy reorganization, (12) Mulhauser, Harvie and Gargaro each signed certifications contained in SEC filings during the class period, which stated that they had reviewed and evaluated Exide's internal controls, and that such controls were effective, and (13) the EXCELL lean program, one of Exide's restructuring initiatives, met with resistance from middle management and was not successfully executed, and thus, caused increased rather than decreased costs. (Pls. Br., at 34-35; Compl. at ¶¶ 92-95, 97, 102, 104-106, 108-112, 116, 122-123, 127-129.) Further, plaintiffs note that Gargaro discussed the amendments Exide obtained to its Senior Credit Facility with the investing public,

and thus, should be charged with knowledge of the company's ability or inability to comply with those covenants.  (Pls. Br., at 38.)

Plaintiffs have not relied on generalized imputations of knowledge and tenuous inferences alone to establish scienter. see In re Alpharma Inc., 372 F.3d at 151 ("[P]laintiffs' allegations rest on nothing more than a 'series of inferences . . . too tenuous to amount to one of those highly unreasonable omissions or misrepresentations that involve not merely simple or even inexcusable negligence, but an extreme departure from the standards of ordinary care.'").  In contrast, plaintiffs have shown specific facts supporting a strong inference that, at a minimum, defendants presented "a danger of misleading buyers or sellers that [was] either known to [them] or [was] so obvious that [they] must have been aware of it."  In re Digital Is., 357 F.3d at 332.  Plaintiffs detail a long list of difficulties Exide encountered during the class period, which were either brought to the individual defendants' attention or such that persons in their positions would have been aware of them, and these difficulties suggest that defendants knew their statements regarding Exide's bankruptcy reorganization and financial condition were false or misleading.  See In re Honeywell Int'l Inc. Sec. Litig., 182 F.Supp.2d 414, 418-20 (D.N.J. 2002) (detailing company's problems during the class period and

41

concluding that the many problems suggested that defendants knew
their predictions about the company's growth and cash flow were
false).  Moreover, we are cognizant of the Third Circuit's
admonition that where, as here, plaintiffs have alleged that
information showing that defendants acted knowingly or with
reckless disregard for the truth is within defendants' knowledge
and control, "the normally rigorous particularity rule has been
relaxed somewhat."  In re Burlington, 114 F.3d at 1418.
Therefore, we find that plaintiffs have sufficiently pled that
defendants either consciously made the statements at issue
knowing they were false or departed from standards of ordinary
care by recklessly disregarding the information discussed above.[4]

### C.   The Materiality of Defendants' Statements

Defendants' allegedly false and misleading statements
concerned Exide's income during fiscal year 2004 and the first
three quarters of its fiscal year 2005, inventory, internal
controls, ability to comply with its loan covenants, and the
success of its bankruptcy reorganization.  Accordingly, the
complaint adequately pleads that the statements at issue
concerned material facts that were likely viewed by reasonable

---

[4] Our analysis on this issue finds scienter sufficiently
pled on the basis of "conscious" or "reckless" behavior.  See In
re Suprema Specialties, Inc., 438 F.3d at 276.  We do not reach,
at this juncture, the question of whether the alternative test of
"motive and opportunity" to commit fraud is also justified by the
pleadings in this case.  Id.

investors as affecting the "total mix" of information available to the public.  See TSC Indus., Inc., 426 U.S. at 449. Furthermore, the statements are sufficiently pled as material because Exide's stocks dropped immediately after Exide revealed that (1) its bankruptcy reorganization had not positioned it as well as previously thought, (2) it expected to violate its EBITDA covenant and leverage ratio covenant for the fiscal year ending March 31, 2005, and (3) unanticipated items impacted its preliminary results during the quarter, including 4.5 million write-offs for obsolete inventory and the need to implement a more structured forecasting methodology.  (Compl., at ¶ 134-137.) See In re Merck & Co., Inc., 432 F.3d at 269.  Therefore, plaintiffs have met their burden under Section 10(b) and Rule 10b-5 of alleging that defendants' statements were material.

### D.   Reasonable Reliance and Damages

Defendants do not contend that plaintiffs failed to properly plead reasonable reliance.  Thus, the Court will not address that element of plaintiffs' Section 10(b) and 10b-5 claim.  Moreover, in the complaint, plaintiffs set forth facts supporting an inference that defendants' allegedly false or misleading statements were a substantial factor in causing the loss of their stock's value.  See Semerenko, 223 F.3d at 187.  Plaintiffs explain that Exide's stock droped after the "true facts" were revealed.  Accordingly, plaintiffs have sufficiently pled that they were damaged by defendants' conduct.

### E.    The PSLRA Safe Harbor Applied Here

A forward-looking statement is defined as including statements (1) "containing a projection of revenues, income (including income loss), earnings (including earnings loss) per share, . . . or other financial terms", (2) of management's plans and objectives for future operations, and (3) "of future economic performance".  15 U.S.C. § 78u-5(i).  Present tense statements may constitute predictions about a company's future.  See GSC Partners CDO Fund v. Washington, 368 F.3d 228, 242 (3d Cir. 2004) (finding present tense statement about collectability was a prediction of the likelihood of collection, and thus, was a "classic" forward-looking statement).

Most of the alleged false or misleading statements at issue pertain to past events and earnings, and therefore, are not "forward-looking" according to the definition set forth in Section 78u-5(i)(1).  However, defendants contend that "Exide's highly qualified predictions that, based on its then-current financial forecasts and plans, it believed it would comply with the loan covenants in its Senior Credit Facility, and Exide's optimistic statements regarding [its] prospects for future performance post-bankruptcy" are protected by the safe harbor provision (Defs. Br., at 27-28 (internal citation omitted).) Further, the complaint does list statements in which defendants projected financial terms, or described management's plans and

44

objectives for future operations or future economic performance
including, defendants' statements regarding Exide's (1) plans to
"streamline and simplify its global operations though a number of
cost reduction, quality and productivity initiatives", (2)
ability to comply with its loan covenants for the foreseeable
future, (3) reorganization providing a foundation for future
growth, profitability, and long-term value for shareholders, and
(4) belief that it would realize "additional benefits from the
lead hedging, pricing actions, restructuring and cost reductions
implemented in the first half of fiscal year 2005 to mitigate the
impact of higher lead prices."  (Compl., at ¶¶ 39, 45-46, 48, 54-
55, 58, 65, 71, 75.)  These statements are forward-looking
because they discuss management's plans for Exide's future
financial performance and growth.

Plaintiffs, however, have pled facts that allegedly were
known to the individual defendants at the time they made the
statements at issue, which give rise to an inference that the
individual defendants knew that such statements were false or
misleading when made.  See In re Advanta Corp., 180 F.3d at 536
(noting that the safe harbor does not apply if the statement is
made with actual knowledge that it is false or misleading).
Plaintiffs do not attempt to establish actual knowledge by
relying on statements made after the class period, but instead
rely on alleged facts that could demonstrate and corroborate what

the individual defendants knew during the class period through the confidential informants.  Compare Advanta, 180 F.3d at 536 (noting that contradictory statement made nine months after statement at issue did not establish that speaker knew statement at issue was false when made).  Therefore, defendants' statements are not protected by the statutory safe harbor.

## III. Section 20(a) Standard Applied Here

Plaintiffs have adequately pled that Exide is liable under Section 10(b) or Rule 10b-5 with the particularity required by the PSLRA.  Plaintiffs also allege that Mulhauser, Gargaro, and Harvie, "because of their positions of control and authority as officers and/or directors of [Exide], were able to and did control the content of the various SEC filings, press releases and other public statements pertaining to [Exide] during the Class Period."  (Compl., at ¶ 24.)  Plaintiffs further allege the Mulhauser, Gargaro, and Harvie are primarily liable for the misrepresentations discussed above.  (Id.)  Accordingly, plaintiffs have sufficiently alleged both an underlying violation by the company, and circumstances establishing Mulhauser, Gargaro, and Harvie's control over Exide's actions, and thus, have satisfied the requirements for alleging controlling person liability under Section 20(a).  See Jones, 274 F.Supp.2d at 645.

**CONCLUSION**

The Court, for the reasons stated <u>supra</u>, will deny the
motion.  The Court will issue an appropriate order.


　　　　　　　　　　　 <u>　　 s/ Mary L. Cooper 　　</u>
**MARY L. COOPER**
United States District Judge

47